243205 Mutual Fund Opt-out v. Andrew Calamari Attorney Rolnick. May it please the Court, I'm Lawrence Rolnick, here on behalf of investors who purchased shares in a mutual fund that was fraudulently inflated and brought a claim against the underwriter of those securities, and that claim against the underwriter was permanently enjoined in the district court on the ground that the underwriter was a fraud. The claim against the underwriter might have a claim for indemnification against the fund, and my first argument is that that injunction violates the Anti-Injunction Act. The claim against the underwriter is clearly an action in personam. The Supreme Court in Klein v. Burke made it very clear that federal courts cannot enjoin in personam actions in state court proceedings, and even if the federal court had a claim for indemnification against the fund, that would be a violation of the Anti-Injunction Act. If the federal court had in rem jurisdiction over the remaining assets of the hedge fund, that jurisdiction might be implicated if and when Quasar made a claim against the fund for indemnification, either in terms of legal expenses or an actual indemnification. But the legal expenses weren't. I mean, the ultimate liability of indemnification is a contingent, down-the-road thing, but I'm understanding that the advancing liability of indemnification is a contingent down-the-road thing. But I'm understanding that the advancing defense expenses was happening in real time right then and there, and so it wasn't a question of whether or not Quasar would be able to draw down from the fund into some future time. It was happening as an incident to the litigation. Right. And so my – Has that changed the analysis? Right. My point, though, is that if Quasar were making that application to the fund and the federal district court thought that it had in rem jurisdiction over the fund, then it could decide at that point, yes, we should set aside a reserve and pay these expenses as we are in connection with other jurisdictions. Right. And so Quasar could say, well, I'm going to stay this injunction. I'm going to stay this request for advancement until some point down the road. Or it could say, I'm going to enjoin you, Quasar, from getting this advancement. But what I'm – the point I'm making is that even if it had some in rem jurisdiction over the remaining assets of the fund, that didn't give it jurisdiction to enjoin our claim against Quasar. You know, the proper proceeding might have been for the court to say – and if Quasar had made that claim, saying advance me my funds, then the court could say, well, is that advancement even legal? Is that a violation of public policy? Is that actually required under your contract? Because the indemnification contract between the fund and Quasar also had a provision in it saying if this indemnification is contrary to law, then you can't have it. So what I'm saying is that issue was never presented, because Quasar never went to the fund and said advance my funds, and the court never adjudicated that. It just said anybody who has a claim that might lead to a claim for advancement, you're permanently enjoined. And I'm saying that's an impersonum action that is clearly not within the court's – right? The Quis Partition injunction here would only be in aid of its jurisdiction, and that would only be if our claim were somehow interfering with its in rem jurisdiction. Is it just subsection 2 of the exception in aid of jurisdiction, or does it also cover subsection 3 to protect and effectuate its judgments, given that there is a proposed settlement here with the class members? And I know your clients opted out, but doesn't the district court have, under the All Writs Act, an interest in protecting the amount of money that's ultimately due to be distributed to the class members? Well, if you look at any other case, the court might have some jurisdiction over that fund, but that doesn't give him the right to eliminate lawful claims. So if somebody comes to the fund and says, you owe me money, right, then the proper thing to do is to set aside a reserve to pay that fund. I mean, even in bankruptcy, for example, you don't just eliminate the claims that might be made against the estate. Is it claims they're eliminating, or is it just putting a hold on the money so that it can be reserved? No, they're eliminating our claim. The court eliminated our claim. It permanently enjoined it. So even in a bankruptcy situation, for example, somebody comes to the bankrupt estate and says, pay me, and maybe there are limited funds, and maybe they get paid, and maybe they don't. Quasar would be in that position vis-à-vis the fund. But this court didn't enjoin Quasar. The court enjoined us. But if your clients were to lose here, they would receive, presumably, a pro rata share of whatever the special reserves remaining assets would be, correct? After the fund pays its debts, pays its expenses, one of which might be to pay legal fees to Quasar, just like it's paying legal fees to the trustee who's litigating claims, paying the cost associated with that. Yes, after it pays its expenses, whatever's left over comes to us. Is that a risk they assumed when they opted out of the class? So when we opted out of the class, just to be clear, there had been a class action case against Quasar, among others. Quasar settled that claim. Quasar paid money to all the injured investors in the class, right? And we were then given the opportunity to reject that settlement from Quasar and others and to proceed individually. And now that we've done that, we're being told, well, you don't have the right to pursue Quasar. No, I understand the factual scenario. My question is, is that a risk that your clients assumed by opting out of the class? Absolutely not. When you opt out of a class, you don't assume the risk that your claim is going to be enjoined. You might take the risk of collectability. You might go proceed my claim against Quasar. Why don't you assume the risk that because there's this other lawsuit that's now been settled and money's going to be paid out, that there may be not much left? There may be crumbs left. I mean, that is the risk, isn't it? No, that's not. So the risk I'm taking when I opt out is that maybe my claim against Quasar won't succeed. Or maybe I won't be able to collect against Quasar. I'm not taking the risk. You won't be able to collect against Quasar, one, because your claims may not succeed, and two, because there may be nothing left, right, in terms of assets. No, no, but I might not be able to recover against Quasar because Quasar can't pay the judgment. Right, because their assets are gone. That's not the case. Quasar is liquid. Quasar has money. Counsel, has money now because there's money that's being held to pay out all these other claims in the class action. I'm not suing the fund. I'm not taking it. I would be at risk if I were suing the fund, that the fund might not have assets, like any other bankrupt entity. I'm suing Quasar, the underwriter. They're solvent. They have money. They're statutorily liable to me. So once this lawsuit is settled, you can sue them, presumably, right? You can continue your suit. I'm being permanently enjoined from ever suing Quasar, the underwriter who issued these securities. I have a Section 11 claim, prima facie, under Section 11 to sue Quasar. Quasar is solvent, and I'm being permanently enjoined from bringing that lawsuit. It has nothing to do with any claims against the mutual fund. I'm not bringing a claim against the mutual fund. And one of the problems with this injunction, there's no Second Circuit case that has ever gone remotely this far. If you look at the leading case, excuse me, Baldwin. Maybe this is actually a good time to take a break. I know we're going to get to hear from you again on rebuttal, but it looks like your time, we're past your time. And so maybe we'll... If I could, could I just finish this point about Baldwin, Your Honor? Sure. So Baldwin, the Second Circuit case that is closest, didn't involve a permanent injunction at all. It was only an injunction of limited duration to see whether or not cases that were proceeding in that court might result in settlement, the settlement of which would have obviated the remedy that was being sought in the State courts. And so the Second Circuit said, let's just put a limited duration injunction on those State court actions and see if these cases can get settled, because if they do get settled, that will moot those cases. No Second Circuit case has ever supported a permanent injunction of a State court in personam action, particularly in a case like this involving wrongdoing, where we have claims under Section 11 and the risk of nonpayment is supposed to be with the wrongdoers, not with the innocent investors. Thank you.  Could you... I'm sorry to just jump right in. That was a really important point, because I know you mean really heavily on Baldwin. It's really the only case that sort of opens the door to enjoining a State court in personam action, even if we treat this as a Federal in rem action. But that was a pause button case. It was, we're going to stop your litigation until this one's done. It didn't actually cut off anybody's claims. This purports to be a permanent injunction that would prevent the opt-out plaintiffs who didn't get the benefit of the settlement that the opt-in plaintiffs got, never got compensation from Quasar or the funder or anybody else, from ever seeking that. Is there anything besides Baldwin that you can point to? Because it seems like Baldwin doesn't go nearly that far. Well, I would point the Court back to the statutory language of the All Writs Act, which allows for the issuance of an injunction where it's necessary or appropriate in aid of the Court's jurisdiction. And, you know, the Anti-Injunction Act is the other side of the same coin, where it allows, it provides for an exception to allow injunctions where it's necessary in aid of the Court's jurisdiction. And that's what just... And I've always wondered, and I'm sure there's an answer to this, but it does drop the appropriate. So it seems like if appropriate's not redundant, if appropriate expands the universe of what you could do under the All Writs Act, the Anti-Injunction Act narrows that somewhat. It's not just the flip side. I agree, Your Honor. I think the language is clear. And that's what Judge Castell found here, is that the injunction was necessary in aid of the Court's jurisdiction over the res, which is the limited remaining assets of the fund, specifically the special reserve. And what is the statutory authority for the Court's assertion of exclusive in rem-like jurisdiction over the res? So the SEC sued under the Investment Company Act. And if you look at the complaint that the SEC filed against the fund itself, the jurisdictional provision that it invoked is under the Investment Company Act. Is that the 15 U.S.C. 88-4? Is that the provision? Yeah. I believe that's right, Your Honor. So that, what's interesting about that statute is it does give exclusive authority to the District Court to marshal and distribute the assets in an action to enforce 88-7, which this is not. By inference, it doesn't give, in my mind, exclusive jurisdiction in other contexts. It may give it the authority to manage the process for distributing the res, but this goes further and cuts off claims. That's right. And then you go to the All Writs Act for the authority of the District Court to issue the injunction. So it's marrying the authority to marshal the assets of an insolvent estate under the Investment Company Act married with the All Writs Act authority to issue an injunction in aid of the court's jurisdiction over that res. And that provides the statutory authority and invokes the court's equitable powers to do what it did here. So the court, I mean, it's interesting. I think these analogies, and we have these very statutory frameworks that create actual in-room proceedings. And those are accompanied by lots of guardrails and provisions. And it seems like what the implications of your argument are that in the context of this non-statutory, essentially equitable, proceeding, there are no guardrails, and the court can literally decide to pay people who've released their claims in a class-action settlement and deny the ability of other people to pursue third-party claims because those third-party claims might incidentally draw down the fund. Is that? I think that is what the court's authority is. And I think the Supreme Court, in the Klein case that Mr. Rolnick invoked from 1922, over 100 years ago, if you read that opinion, the Supreme Court, looking at an opinion from the Seventh Circuit, said, you know, this type of injunction can be appropriate in these types of situations where you have an insolvent estate and the court needs the authority to enjoin other parties, other lawsuits, in order to marshal the assets to achieve what the district court believes is the most equitable distribution of the remaining assets. It's like a bankruptcy or it's like a receivership situation where a district court sitting in equity has broad equitable powers to do what it thinks is best, is most fair overall. Because as the court has recognized repeatedly, these types of situations where you have a fund that's imploded, where you have shareholders who will not be made whole, hard choices must be made. And that power has been invested to the district court. But it's tied to... So let me ask, though, if we were in bankruptcy and there were some guardrails, as I understand it, the shareholders here that the district court, through the special master, wants to compensate more from the fund, are all shareholders, include a large universe of shareholders who released their claims against the fund in exchange for a settlement that they received money for. And so in order to accomplish its goal of getting even more money to these parties who no longer have a legal claim against the fund, the fund is going to cut off, essentially terminate, a legal claim by people who never got the benefit of that settlement and never released any claims against a third party. Even if they were authority, I'm trying to figure out what's equitable about that. Okay. Well, as Judge Kahn observed, Mr. Rolnick's clients assumed that risk. When they opted out of the lawsuit of the class action settlement, they assumed the risk that their claims may or may not proceed. It's sort of a circular, right? What risk they assumed depends on what the law is as we determine, right? If we conclude that this is beyond the court's authority, then they didn't assume that risk. And if we conclude that it's within the court's authority, they did. So assuming the risk doesn't feel like it does anything other than restate the issue. Yeah. Well, Your Honor, I mean, this is a matter of math. There are limited resources, limited assets to be marshaled. As Your Honor observed at the outset of the argument, the fund is currently has to indemnify, has to advance legal fees to defend Quasar, which has a right to defend itself. And under the contract, the plain language of the contract, the fund must pay those legal fees now. That means funds are being siphoned out of the Special Reserve, which would otherwise go to all shareholders, including Mr. Rolnick's finance, on a pro rata basis. But on top of that, you have the risk that the fund is going to have to indemnify any judgment or settlement that is reached between Quasar. Why wouldn't that contractual obligation trump the beneficent desire to provide more resources to people who have no legal claim because they've released them? Well, it's about what's fair for all of the shareholders, all of the remaining shareholders. So just take, for instance, if, like, Mr. Rolnick and Quasar, if the claim was allowed to proceed and there was a settlement and they settled for $10 million, that $10 million could potentially have to be paid out of the fund. So there's $100 million left. That $100 million would, let's say approximately $100 million, would be otherwise distributed to all shareholders. But if the fund has to pay $10 million just to a subset of the shareholders, Mr. Rolnick's clients, that means there's only going to be $90 million that would go to everybody. So that's inherently inequitable in the sense that Mr. Rolnick's clients are essentially asking to get in the front of the line and to get a larger share of the pie of what's left. No, wait a minute. On the equitable distribution that you're describing, they're going to get less than the others because the others got a big chunk of money from the opting into the settlement, and then they're going to get a prorated share versus the ones who opted out who would only get a prorated share. So they're actually going to end up with less. But, Your Honor, Your Honor is also assuming, and, you know, Mr. Rolnick kind of elides this point, that the Section 11 claim and they have a Section 12 claim, it's joint and several liability. There are other defendants, there are other deep pockets out there from whom Mr. Rolnick and his clients could recover completely. So they could end up with — But there's a statutory right to recover from this client, and I'm just trying to figure out, if we were in bankruptcy court, is there any dispute that the bankruptcy court would not be able to simply decree that they think it's fairer that these individuals with no legal claim should get more money, and therefore they're going to cut off the legal claim against a third party? Well, Your Honor, frankly, I don't know what the — you know, in bankruptcy, whether or not that would be allowed or not. But here, I think what this Court has to do is take a look at what Judge Costell is faced with, the situation of whether — what is the most equitable approach to distributing the limited res, right? And, you know, it's in the court — district court's exercise of its equitable discretion, determines that it would be unfair to allow these subset — small subset of shareholders to get a larger piece of the pie, of the remaining pie, that would otherwise be available for equal distribution, pro rata distribution, which the court has determined is — Right. I just think — That would be — I hear you. That would be inequitable. And I think, just as a matter of review, Your Honor, too, I think this is a question — I think this is a factual question to which Judge — this Court would defer to Judge Costell. So let me go back to the legal question, because you're right. You're right. My sense of what's equitable may not be the same as the judge's. But in terms of the legal — right, legal framework here — Yeah. The only case in the, what, 100 years since Klein, in which this Court has endorsed an injunction of a state law action on the basis — for an impersonum state law action, is a case in which it was a temporary delay of claims that were completely overlapping, not only as to subject matter, but as to parties, with the claims that the Court was trying to close the deal with. And there was an implication that the state court claims were vexatious. Am I — I mean, that's the case you're relying on to say that we can do this here under the — that and then the sort of general assertion that this is necessary. Because I don't think it's — necessary doesn't mean it will enable the Court to achieve the result that it thinks is the fairest, right? Necessary means it will enable the Court to exercise its jurisdiction. Yeah, exactly. And I think that's an even stronger argument, that the Court, in order to exercise its jurisdiction, found this injunction absolutely necessary. And Your Honor is correct. The Second Circuit has never held this. In the — the Judge Gardefee's decision in reserve fund is the most factually similar. Obviously, that's a district court case. But we would urge the Court to take a look at Judge Gardefee's reasoning, which is on all fours here. But contrary to what Mr. Rolnick has argued, the Second Circuit has never foreclosed this as a possibility. The Second Circuit has never strictly required that both actions be in rem. And here, I think Mr. Rolnick essentially conceded, Judge Costell has in rem jurisdiction over the limited assets of the fund. So tell me about that. I'm not sure I heard it quite as a concession. I thought it wasn't even if we treat it as. But tell me again where the statutory authority is to call this in rem, to say I have exclusive jurisdiction over the rest. Well, I don't know that the statute, the Investment Company Act that provided the jurisdiction here, uses the term in rem. But it is like — it gives the district court jurisdiction over the remnants of the investment company itself and all of its assets. And that's essentially a res, right? Right. And the state court proceeding is not a proceeding that is seeking those assets. I mean, it's interesting — it's interesting that there was an agreement not to pursue the fund in state court as an opt-out plaintiff. But the state court action is proceeding against a third party, and that third party — But, Your Honor, because of the indemnification and advancement obligations, it's essentially proceeding against the fund itself. And that's why — that's why — that's why this case is different from all the Second Circuit cases like Retirement Systems of Alabama, Wiley, and Shurkman that Mr. Rolnick relies upon. It's because here, the in personam state court case, and allowing that case to proceed directly interferes and impedes the district court's ability to carry out its jurisdiction and make a program of distribution. Why couldn't the district court enter a temporary injunction, sort of as in Baldwin, that dissolves when the fund is completely dissipated? Well, the problem is, is the fund has contractual indemnification and advancement obligations. Right, but if it doesn't have money, what's the — what's the recourse for Quasar if that happened and then the case went forward in state court against Quasar? Does it have remedies against TAP, or is it just doesn't get to — Well, it could potentially have — Mr. Calamari, the special master, could potentially have personal liability if he simply flouts the contractual obligations of the fund. I think Quasar would have remedies before Judge Costell and could potentially come after Mr. Calamari himself if he were just to choose, as Mr. Rolnick suggests, to flout the contractual obligations. And moreover, it would be a direct violation of Judge Costell's order appointing Mr. Calamari, by which it requires him to reserve for the indemnification, potential indemnification obligations of the fund. It requires him to exercise fiduciary duties. And I think, you know, there are some really old cases we found from the Second Circuit where bankruptcy trustees or receivers, where they just pay out all the money and they don't, like, take into consideration that there are creditors out there, potential creditors out there, who have claims against the fund, who would be left high and dry. You know, the indemnification claims, the advancement claims, those are claims of a creditor against the fund, which are superior to the claims of simple shareholders. So, you know, Mr. Calamari has to abide by those obligations. Right. So that's an interesting point that you made. Isn't it odd that we're saying that the master, the court through the master, is empowered to cut off the superior claims in favor of the inferior ones? Well, I think that's typically what happens in any kind of receivership or bankruptcy situation where there are secured creditors, unsecured creditors, and then equity holders. Right, but usually the ones with the superior claim to get money first, right? And so what you're asking to do, you just asserted that the contractual obligations to Quasar are superior to whatever obligations there might be to the shareholders for pro-rata distribution. And if that's true, it seems odd to say that in an effort to favor the inferior, they're not even creditors, the people we'd like to get money to. The shareholders. They deserve it. It wasn't their fault this all happened. But you get to cut off a superior claim. Well, you have to cut off the claim that is essentially a claim against the fund, right? So enjoining the plaintiff's claims against Quasar allows Mr. Calamari to move forward with the distribution because it extinguishes the risk of that indemnification. Right. You understand the irony that I'm pointing out. You're emphasizing the seniority of that, the priority of that obligation as a reason why it's okay to extinguish the obligation with priority. Right, if you extinguish it. But it's not like we're cutting off money that would otherwise be going to Quasar. We're cutting off an obligation that the fund could potentially incur. You're cutting off Quasar's liability in the first instance. And it allows the shareholders to get compensated through a pro rata more equitable distribution. And, Your Honor, I would just point, this is language, I think dicta, but in Wiley v. Weiss, Second Circuit 2012, the court said, we have recognized, however, that an in personam injunction may be appropriate under certain limited circumstances. So I think this court has recognized that there could be scenarios like this one out there that when the district court has in rem jurisdiction over limited assets, there's a state proceeding that's in personam, that an injunction to enjoin that in personam proceeding could be appropriate if it meets the requirements of the Albritts Act and the Anti-Injunction Act, which is it's necessary to in aid of the district court's jurisdiction. Thank you. Thank you, Your Honor. We appreciate your argument, and we'll hear again from Attorney Roland. Thank you, Your Honor. First, to be clear, if the reserve, if the mutual fund were in bankruptcy, our claim against Quasar would proceed, and Quasar's claim for indemnification might or might not get paid, depending on what the assets of the estate were. A bankruptcy would never enjoin third-party claims against the non-debtor. So the idea that bankruptcy would enjoin this claim is completely wrong. If it were in bankruptcy, our claim would proceed, and Quasar would be at risk or not of having its indemnification paid. Second, even in reserve fund, which I would submit was wrongly decided, but even reserve fund allowed non-indemnifiable claims. The injunction did not enjoin non-indemnifiable claims, and the court segregated indemnifiable claims and non-indemnifiable claims. And non-indemnifiable claims were any claims that involved willfulness. I raise that because in reserve fund, there was no wrongdoing. Reserve fund was just basically a run on a ‑‑ So are the claims against Quasar, there's a willfulness claims against Quasar? Well, it certainly could be. I mean, just because we don't need to show it, you know, they have a due diligence obligation. We're talking about enjoining litigation, and the litigation that we're talking about enjoining are their claims for willful misconduct. Right. I'm asking you as a matter of fact. Well, we haven't been able to proceed with our claim against Quasar. Was it not filed at all, ever? We filed it, yes. Okay, so what's it say? So our claim is that they failed to conduct due diligence that's statutorily required. My contention would be if you failed to conduct statutorily required due diligence, that would certainly constitute willfulness. The fact that we don't have to prove willfulness doesn't mean that they didn't act with willfulness. And my point is that even Reserve Fund, which I contend is wrongly decided, didn't indemnify claims for willfulness. And a Section 11 claim does very strong public policy that they're not indemnifiable at all. The SEC's position is that they're not indemnifiable, and specifically claims against underwriters are not indemnifiable. And the reason why Lobis and Credit Suisse have held that those Section 11 claims for indemnification are not indemnifiable is because the whole point of Section 11 is to say if you're an underwriter and you're going to be selling securities to the public, you have to conduct due diligence. And if you can simply offload that liability to the issuer, the company that's issuing the shares, then you have no real incentive to do the due diligence in the first place, which is what we want you to do. So we're not going to allow you to pursue those claims or enforce those claims for indemnification. So here you have the situation where the alleged wrongdoer under Section 11 who failed to conduct the necessary due diligence that allowed these shares of this mutual fund to be fraudulently inflated and sold to our investor clients, they're getting protected because they have asserted a claim for indemnification against the issuer, which is itself not even a lawful obligation. So it's just really turning the entire world of Section 11 on its head, because Section 11 says, and my colleague made the point, well, there are other defendants you might be able to recover from, and all wrongdoers under Section 11 are jointly and separately liable. Well, we might not recover against any of those other wrongdoers. The whole point of Section 11 joint and separate liability is we can recover all of our losses against Quasar, and then Quasar has the risk of whether or not that claim can be paid by the fund, and whether it's legal, whether it's enforceable, whether Globa supplies or Credit Suisse supplies, none of that was ever considered. And in terms of Mr. Calamari's alleged liability, he's picked winners and losers. U.S. Bank Corp. has the same indemnification rights against the fund that Quasar has, yet he said, well, I'm not going to join U.S. Bank. U.S. Bank, you know, I'm not going to join the litigation. Why did he do that? He did that because he's suing U.S. Bank, so he's made a calculation, well, I think I can get more money from them than they would have back against me. I think the argument is if you buy the sort of global argument that that's within his authority, he can pick winners and losers. I mean, he is picking winners and losers even aside from that, right? He's saying opt-out plaintiffs who have a claim against Quasar are losers, and we'll share opt-in plaintiffs actually are winners, and we'll share the benefit of what's left in the fund with everybody. I mean, if the idea is he's got fairly unfettered authority to do what seems equitable, then I don't know that that picking winners and losers is any more shocking than any other aspect. Yeah, I agree with that, and I don't think even a federal court has the power to simply enjoin state court in personam actions. No Second Circuit case has ever done it. Wiley certainly never did it. I mean, in Wiley, the situation was that the federal court had said, again, limited duration. I'm going to stay you, state court, and your trial date because I want to try my case first. Right, but that wasn't about a limited rem. I mean, that wasn't that analysis. I don't even think the court has in rem jurisdiction here, and I didn't concede that the court had in rem jurisdiction. I was just simply saying even if you just assert that he has in rem jurisdiction over the fund, that would only give him the power to adjudicate Quasar's indemnification claim. It wouldn't give him the right to stomp out and enjoin our claim, and my view is it's contrary to Congress' intent under Section 11, which gives Joynton several liability. I think we've got your argument, so I appreciate it both. Thank you both. Well argued, and we'll take this under advisement.